UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT FOR NEW YORK
-------------------------------------------------------------x


GATT COMMUNICATIONS, INC.,                     Case  No. 10 CV 00008
                                               (DAB/MHD) ECF CASE

                PLAINTIFF,

-AGAINST-

PMC ASSOCIATES, L.L.C, d/b/a PMC Associates,
PMC ASSOCIATES, INC. d/b/a PMC Associates,
PHILLIP M. CASCIANO ASSOCIATES, INC. d/b/a ,
PMC Associates, PHILLIP M. CASCIANO, BRYAN
CASCIANO, THOMAS WINELAND and VESEL
RADIVIC, JOHN DOE, HENRY HOE and
RICHARD ROE,

                DEFENDANTS.

-------------------------------------------------------------x


## COMPLAINT AND JURY DEMAND


       Plaintiff Gatt Communications, Inc. respectfully asserts the following

claims against the Defendants:


### Jurisdiction

1. This action arises under the anti-trust laws of the United States (Title 15

United States Code). Subject matter Jurisdiction is conferred upon this Court by

15 U.S.C. §15 and also by 28 U.S.C. §1337(a) and also by 28 U.S.C. §1331.

Diversity Jurisdiction is conferred upon this Court by 15 U.S.C. §1332 (a) in that

the Plaintiff and Defendants are citizens of different states. Venue is proper in this

district pursuant to 28 U.S.C. §1391(b)(2).

## The Parties

2. At all times relevant hereto Plaintiff Gatt Communications, Inc.

(hereinafter "Gatt") was a corporation formed under the laws of the State of New

York and first maintained an office at 3151 Steinway Street, Long Island City,

New York 11103 and subsequently opened an office as well at 5th Floor, 20

East 49th Street, New York, New York 10017 and at 2357 Route 32, New

Windsor, New York.

3. Since at least 2002, Gatt has been in the business of buying, marketing

and selling commercial land mobile radios, equipment, accessories, and parts in

the State of New York. From 2002 to the Fall of 2007, Gatt was at all times a

recognized and licensed New York State dealer in Vertex radios and equipment.

4. At all times relevant hereto, the President of Gatt was Pietro Gattini

("Gattini") who was also the principal shareholder of Gatt.

5. Upon information and belief, at all times relevant hereto, Defendant

PMC Associates, Inc. (hereinafter "PMC Associates") was a corporation formed under the laws of New Jersey and maintained an office at Unit 106, 8 Crown Plaza, Hazlet, New Jersey 07730-2472.

6. Upon information and belief, at all times relevant hereto, Defendant PMC Associates, LLC (hereinafter also "PMC Associates") was an LLC formed under the laws of the State of New Jersey and maintained an office at Unit 106, 8 Crown Plaza, Hazlet, New Jersey 07730-2472.

7. Upon information and belief, at all times relevant hereto, Defendant Philip M. Casciano Associates, Inc. (hereinafter also "PMC Associates") was a corporation formed under the laws of the State of New Jersey and maintained an office at Unit 106, 8 Crown Plaza, Hazlet, New Jersey 07730-2472.

8. Upon information and belief each of the aforesaid defendants doing business as PMC Associates was owned either in whole or in controlling or dominating part by Defendant Phillip Casciano and/or Defendant Bryan Casciano and/or Mike Casciano.

9. Because each of PMC Associates, Inc. and PMC Associates, LLC and Philip M. Casciano Associates, Inc. appear to be in the same business,

appear to occupy the same offices, appear to be owned or controlled by the same or related persons, appear to utilize the same employees and appear to infrequently distinguish their separateness of legal entity in their external business documents but rather go under the name "PMC Associates," all three entities, as already noted, are referred hereinafter as "PMC Associates."

10. Upon information and belief, at all times relevant hereto PMC Associates was, inter alia, in the business of purchasing, selling, marketing, distributing and promoting commercial land mobile radios, accessories and parts including the radios, accessories and parts which were manufactured, produced, imported, sold and/or distributed by Vertex Standard USA, Inc. ("Vertex"), a California corporation maintaining an office at 10900 Walker Street, Cypress, CA 90630.

11. Upon information and belief, at all times relevant hereto the Vertex mobile radios, accessories, equipment and parts purchased, sold and/or distributed by PMC Associates bore the names: "Vertex," "Standard," "Vertex Standard," and "Yaesu."

12. Upon information and belief, at all times relevant hereto the senior officers and principals of PMC Associates were Phillip Casciano and Mike

Casciano.

13. At all times relevant hereto the following persons were also employed by PMC Associates, to wit: RJ Astoreca, Vesel Ramovic, Bryan Casciano.

14. At all times relevant hereto PMC Associates acted as a sales representative and the manufacturers' representative for Vertex in the State of New York, actively "spotting" and recruiting dealers for Vertex to sell Vertex radios and equipment, and that such a relationship had existed from the early 1990s.

15. Upon information and belief, Defendant Phillip M. Casciano ("Phillip Casciano") is a resident of the State of New Jersey and an owner, principal and officer of PMC Associates and maintains his residence in Flemington, New Jersey and his office at 8 Crown Plaza, Hazlet, New Jersey 07730-2472.

16. Upon information and belief, Defendant Bryan Casciano ("Bryan Casciano") is a resident of the State of New Jersey and a principal and officer of PMC Associates and maintains his residence in Flemington, New

Jersey and his office at 8 Crown Plaza, Hazlet, New Jersey 07730-2472.

17. Upon information and belief, Defendant Vesel Radivic ("Radivic") is a resident of the State of New Jersey and maintains his residence at 10 Warrenton Lane, Colts Neck, New Jersey 07722.

18. Upon information and belief, Defendant Thomas Wineland ("Tom Wineland") maintains a business office and/or residence at 1418 Winding Canyon Ct., Katy, Texas 77493. At all times relevant hereto, Wineland was the Executive Vice President for Sales and Marketing of Vertex.

19. Upon information and belief, Defendants John Doe, Richard Roe and Henry Hoe are persons presently unknown to the Plaintiff who acted in association with or in combination with the Defendants in performing or aiding in the hereinafter specified illegal acts of the Defendants which resulted in damages to the Plaintiff.

## AS AND FOR A FIRST COUNT

## AGAINST ALL OF THE DEFENDANTS
### (Federal Anti-Trust Violation)

20. Section 1of the Sherman Act (15 U.S.C. §1) provides in

relevant part:

> Every contract, combination in the form of a trust
> or otherwise, or conspiracy, in restraint of trade or
> commerce among the several States, or with foreign
> nations, is declared to be illegal....

21.  Section 4 of the Clayton Act [15 U.S.C. §15(a)] provides in

relevant part:

> ...any person who shall be injured in his business or
> property by reason of anything forbidden in the
> antitrust laws may sue therefor in any district court
> of the United States in the district in which the
> defendant resides or is found...without respect to the
> amount in controversy, and shall recover threefold
> damages by him sustained, and the cost of suit,
> including a reasonable attorney's fee.

22. As a licensed Vertex dealer, Gatt was authorized to sell Vertex

radios and Vertex equipment to all persons – including governmental

agencies– in the greater New York City area and was entitled by law to freely

quote and bid on potential contracts in the manner it judged most appropriate

to its own business advantage so long as such prices did not exceed the NYS

Catalogue Contract.

7

23. At all times relevant hereto, PMC Associates was charged by Vertex with the responsibility of soliciting and managing the Vertex dealer network in the State of New York.

24. At all times relevant hereto, PMC, Associates not only undertook to recruit for Vertex to locate and induce sales companies to become dealers in Vertex radios and equipment in New York State, but also to develop, orchestrate and oversee marketing strategies, and to market to and fulfill orders from customers obtained by those New York State Vertex dealers.

25. At all times relevant hereto, upon information and belief, PMC Associates was charged by Vertex with the responsibility of supporting, organizing and orchestrating the sales efforts of the Vertex dealer network in the State of New York to key potential customers such as New York State, City and County governmental agencies in a manner which would assure maximum sales of Vertex radios and equipment at the most advantageous prices to Vertex by engaging in collusive bidding or the making of collusive quotations.

26. At all times relevant hereto PMC Associates was also either itself a dealer in Vertex radios and equipment pursuant to some dealer's agreement

with Vertex, and/or carried on Vertex dealer's activities through one or more subsidiaries or affiliates of PMC Associates and/or was authorized by Vertex to directly submit bids, quotes and proposals incorporating any Vertex radios and equipment and to sell and service Vertex radios and equipment as well as to invoice and collect payments.

27. Upon information and belief, as part of the agreement or arrangement between PMC Associates and Vertex, PMC Associates was entitled to payment of a certain commission, override or fee from Vertex upon every sale by a dealer in Vertex radios and equipment who PMC Associates had helped Vertex to sign up as a Vertex dealer or who PMC Associates was asked by Vertex to oversee and assist.

28. Upon information and belief, as part of its agreement or arrangement with Vertex to be the Vertex sales representative for the State of New York, PMC Associates was entitled to payment of a certain commission, override or fee from Vertex upon every sale made by PMC Associates to a Vertex customer in New York or upon every sale arranged by PMC Associates which was fulfilled in the name of Vertex itself.

29. In late winter, 2002, Vesel Ramovic, an employee of PMC

9

Associates ("Ramovic")  as part of PMC Associates' dealer recruiting efforts

on behalf of Vertex,  came to the Queens, New York office of Metrocom

( a company owned by Gattini then involved in the sale of two way radios and

radio equipment) to persuade Gattini to become a New York State Vertex

dealer.

30. After Gattini expressed his company's interest in becoming a dealer

in Vertex radios and equipment, Ramovic reported the results of his interview

with Gattini to Vertex and Vertex sent an application form to be filled out by

Gattini to allow his company to become a dealer.

31. Gattini thereafter filled an application, arranged for an initial

required minimum order of Vertex radios and equipment for demonstration

purposes to be made to Vertex and received a "Vertex Standard Dealer

Agreement" dated April 2, 2002 which was executed between Vertex and

Metrocom Enterprises, Inc. making Metrocom a Vertex dealer in New York

City, Westchester, Rockland, Orange, and Dutchess counties and in Bergen

county, New Jersey. This agreement is also hereinafter referred to as the

Vertex Metrocom Dealer's Agreement.

32. Shortly after obtaining the Vertex Metrocom Dealer's Agreement,

10

Metrocom, Gatt and Vertex agreed that Metrocom would give up its New York state dealership and be replaced by Gatt as a New York State dealer ("Vertex Gatt Dealer's Agreement").

33. Thereafter, on May 22, 2002, Gatt was approved as a New York State Vertex "level 1" dealer.

34. Within the first year of becoming a dealer in Vertex radios and equipment, Gatt, although selling Vertex radios and equipment by cold calls, became, by volume of sales, one of the most productive Vertex dealers in New York State.

35. From 2002 to the middle of 2007, Gatt, became by volume of sales, one of the most productive Vertex dealers in the United States and was chosen by Vertex to receive several awards for its productivity and achievement.

36. At the time that Metrocom obtained its Vertex Metrocom Dealer's Agreement and again when Gatt obtained the Vertex Gatt Dealer's Agreement, Gattini was told by Vertex that PMC Associates was the sales representative for Vertex for the region which covered New York State and that PMC Associates was responsible for organizing and supporting the sales

11

efforts of New York State Vertex dealers. Gattini was also told to follow PMC

Associates' direction and give PMC Associates total cooperation as PMC

Associates was "very experienced" at marketing and selling. Gattini was also

told that whatever leads were developed via the advertising campaign

provided by Vertex for Vertex radios and equipment in the New York area

would be placed in the hands of PMC Associates which would distribute

such leads amongst the New York State Vertex dealers.

37. PMC Associates, Phillip Casciano and Vesel Radivic represented to

Gatt on a number of occasions that as the Vertex sales representative and

manufacturer's representative for New York State, PMC Associates had to be

involved in and stood ready at all times to try to help Plaintiff with solving

any problems which might arise in Gatt's efforts to build the sale of Vertex

radios and equipment and in return, Gatt was told, it was obliged to keep PMC

closely informed of all of Gatt's sales efforts and progress in contacting,

cultivating, developing and finally selling Vertex branded radios to potential

Gatt customers.

38. At all times relevant hereto, PMC Associates, Phillip Casciano and

Vesel Radivic told Gatt and made it clear to Gatt on behalf of PMC Associates

12

itself that the prompt supply of detailed information about Gatt's marketing and sales efforts to potential and existing customers was an essential part of Gatt's dealer's obligation to Vertex and that the failure to supply such information could result in the cancellation of Gatt's Vertex dealership.

39. At all times relevant hereto PMC Associates, Phillip Casciano and Vesel Ramivic told Gatt and made it clear to Gatt on behalf of PMC Associates itself that as a Vertex dealer, Gatt was obliged to cooperate fully with PMC Associates' directions about how the marketing of Vertex branded radios was to be handled and that the failure to cooperate could result in the cancellation of Gatt's dealership.

40. Upon information and belief, at all times relevant hereto, PMC Associates, Phillip Casciano and Vesel Ramivic told other New York State Vertex dealers and made it clear to other New York State Vertex dealers that the prompt supply of detailed information about each of said other New York State Vertex dealers' marketing and sales efforts to potential and existing customers was an essential part of each of said other New York State Vertex dealers obligation to Vertex as a dealer and that the failure to supply such information could result in the cancellation of Vertex dealerships.

13

41. Upon information and belief, an all times relevant hereto, PMC Associates, Phillip Casciano and Vesel Ramivic told other New York State Vertex dealers and made it clear to other New York State Vertex dealers that every New York State Vertex dealer was obliged to cooperate fully with PMC Associates's directions about how the marketing of Vertex radios and equipment was to be handled and that the failure to fully cooperate could result in the cancellation of Vertex dealerships.

42. PMC Associates, Phillip Casciano and Vesel Ramivic made it clear to Gatt that the communication with and information provided by Gatt to PMC Associates on a regular and ongoing basis about Gatt's marketing and sales efforts and prospective customers was an essential part of Gatt's duty to Vertex under the Vertex/Gatt Agreement.

43. Upon information and belief, PMC Associates, Phillip Casciano and Vesel Ramivic made it clear to other New York State Vertex dealers that the communication with and information provided by such other New York State Vertex dealers to PMC Associates on a regular and ongoing basis about such other New York State Vertex dealers' marketing and sales efforts directed at prospective customers was an essential part of the duty of a Vertex dealer to

14

Vertex under the Vertex dealer's agreement.

44. PMC Associates, Phillip Casciano and Vesel Ramivic made it clear to Gatt on behalf of PMC Associates and themselves that if a New York State Vertex dealer did not conduct its business in a manner fully consistent with the interests of Vertex and PMC Associates, PMC Associates had the power to get Vertex to peremptorily terminate such dealer's Vertex license.

45. Upon information and belief, PMC Associates, Phillip Casciano and Vesel Ramivic made it clear to other New York State Vertex dealers that if a New York State Vertex dealer did not conduct its business in a manner full consistent with the interests of Vertex and PMC Associates, PMC Associates had the power to get Vertex to peremptorily terminate such dealer's Vertex license.

46. PMC Associates and or Phillip Casciano and/or Bryan Casciano and/or Vesel Ramivic also told Gatt, that in the event that Gatt was informed that any invitation to bid or quote which Gatt received in connection with its effort to sell Vertex radios and equipment required more than one bid or quote, PMC Associates was to be contacted by Gatt, and PMC Associates, as the Vertex sales representative, would arrange to supply the other necessary

additional bids or quotes.

47. Upon information and belief, PMC Associates and/or Phillip Casciano and/or Bryan Casciano and/or Vesel Ramivic also told other New York State Vertex dealers besides Gatt, that in the event that any such dealer was told that any invitation to bid or quote which that dealer received in connection with its effort to sell Vertex radios and equipment required more than one bid or quote, PMC Associates, as the Vertex sales representative, would arrange to supply the other necessary additional bids or quotes.

48. Following certain communications failures by government agencies and departments in New York City during the 2001 World Trade Center disaster, Vertex, PMC Associates, Phillip Casciano and Vesel Ramivic made a great effort to coordinate efforts by New York State Vertex dealers to interest such government agencies and departments in Vertex products which were represented to be more effective and reliable than the radio communication equipment widely in use in September, 2001.

49. As part of this effort, PMC Associates, on behalf of Vertex negotiated a New York State Comprehensive Catalog Contract with the New York State Office Of General Services Procurement Services Group on or

about December 21, 2006 for Radio Communications Equipment ("NYS Catalog Contract").

50. The NYS Catalog Contract set the price at which any agency could buy each particular Vertex radio model if such agency did not want to conduct a bidding process for itself.

51. The NYS Catalog Contract did not legally prevent a New York State agency from seeking to obtain Vertex radios at a price per unit lower than the price listed in the NYS Catalog Contract either by quotation or by bid process.

52. The NYS Catalog Contract did not legally prevent a Vertex New York State dealer from offering to supply Vertex radios and equipment at a price per unit lower than the price listed in the NYS Catalog Contract or from participating in any quotation or bid process instituted by an agency.

53. After negotiating the NYS Catalog Contract, PMC Associates , and/or Phillip Casciano and/or Bryan Casciano and/or Vesel Ramivic told Gatt, and, upon information and belief,  other New York State Vertex dealers orally that no New York State Vertex dealer could offer to sell radios to a New York State agency or department at a price below that set in the NYS

17

Catalog Contract. PMC Associates and/or Phillip Casciano, and/or Bryan Casciano and/or Vesel Ramivic also told Gatt, and upon information and belief, other New York State Vertex dealers orally that if any New York State Vertex dealer attempted to give a agency or department a quote or a bid at a price below that set in the NYS Catalog Contract, PMC Associates could and would cause that dealer's Vertex dealer's Agreement to be terminated.

54. To sell Vertex radios and equipment under the NYS Catalog Contract, a New York State Vertex dealer had to have an office which incorporated a service facility within New York State because such Vertex dealer had to have the capacity to service and maintain any Vertex radios and equipment sold to New York State.

55. Because Gatt had several offices in New York State and could offer the capacity to service and maintain Vertex radios and equipment, Gatt was listed in the NYS Catalog Contract as one of the Vertex dealers qualified to make sales under the NYS Catalog Contract. Gatt was entitled to make such sales in Nassau County, New York County, Bronx County, Queens County, Kings County and Richmond County.

56. Upon information and belief, PMC Associates did not have an office

18

in New York State and could not therefore of itself offer the capacity to service and maintain Vertex radios and equipment.

57. As part of this ongoing marketing effort, at all times relevant hereto, PMC Associates, Phillip Casciano and Vesel Radivic made it clear to Gatt and, upon information and belief, to other New York Vertex dealers that because of the high priority of certain core units of the New York City Police Department as a potential customer and show case for Vertex radios and equipment, PMC Associates had been directed by Vertex to organize and direct the effort to sell Vertex radios and equipment to the New York City Police Department patrol unit and special operations unit itself, to try in every case to obtain the award of contracts by the New York City Police Department for PMC Associates itself, and no Vertex dealer was to try to sell Vertex radios and equipment to these select units except under the direction of PMC Associates.

58. On a number of occasions relevant hereto however, PMC Associates, Phillip Casciano and Vesel Radivic represented to Gatt, and upon information and belief, represented to other New York State Vertex dealers, that as the New York State Vertex manufacturer's representative, apart from said core

19

units of the New York City Police Department, PMC Associates would not be selling Vertex radios and equipment directly to New York governmental units and would not be selling Vertex products in direct competition with any New York State Vertex dealer.

59. In or about 2004, Gatt was able through one of its salespersons to to generate interest in the use and possible purchase of Vertex radios and equipment by the New York City Police Department, School Safety Division (hereinafter N.Y.P.D. – SSD").

60. In order to generate such interest Gatt made it possible for N.Y.P.D.– SSD to utilize on a trial basis several model VX-537 and several model VX-417 Vertex radios at Gatt's own cost and helped, through many meetings with administrators of N.Y.P.D.–SSD, Gatt was able to induce N.Y.P.D. – SSD to believe that Vertex radios and equipment were more efficient, reliable and inexpensive than the radios then in use.

61. As a result of this diligent marketing effort by Gatt, the N.Y.P.D.– SSD purchased 28 Vertex radios from Gatt in summer, 2005 plus a model VX-4200 mobile unit and VAC-800 rapid rate charger to allow the N.Y.P.D.–SSD to "bed test" the radios and to extend its trials.

62. Thereafter, in September, 2006, after continued testing by the N.Y.P.D.–SSD of the Vertex radio proved highly satisfactory, Gatt was invited by the N.Y.P.D. to give a quotation for a pending purchase by the N.Y.P.D.–SSD of the order of $1,150,000.00.

63. In response to such invitation, Gatt submitted a quotation which resulted in the N.Y.P.D. – SSD giving to Gatt a partially signed purchase order in July, 2006 indicating the likelihood that N.Y.P.D. – SSD would purchase $1,144,960.20 Vertex radios and equipment from Gatt.

64. During the aforesaid Gatt marketing effort upon and submission to the N.Y.P.D. – SSD, in compliance with the aforesaid instructions of PMC Associates that it be kept generally informed of the sales efforts of Gatt, and in particular of any sales efforts by Gatt directed at the New York City Police Department, Gatt reported every detail of its marketing efforts and sent copies of its correspondence, proposal and the said partially signed purchase order for $1,144,960.20 to Gatt over to PMC Associates, Phil Casciano and Vesel Radivic so that PMC Associates, Phillip Casciano and Vesel Radivic were  aware and had full knowledge of Gatt's negotiating posture and figures.

65. In providing said information and documents with respect to Gatt's

sales efforts to N.Y.P.D.–SSD to PMC Associates, Gatt was relying upon

PMC Associates' and Phillip Casciano's and Vesel Radivic's representations

and statements to Gatt made from time to time that Gatt was obliged to

provide such information and documentation to enable PMC Associates to

guide and support Gatt in such sales efforts and help Gatt to ultimately be

awarded a sales contract from N.Y.P.D.– SSD.

66. Moreover, PMC Associates, Phillip Casciano and Vesel Radivic were

privy to the efforts of Gatt to sell Vertex radios and equipment to the

N.Y.P.D. –SSD because the Vertex radios given to the N.Y.P.D.–SSD for

testing by Gatt and the said 28 units later sold for expanded testing to

N.Y.P.D.–SSD had to undergo installation of special "encode/decode boards"

and programming by PMC Associates at its own Hazlet, New Jersey offices

before delivery to N.Y.P.D.–SSD could be actually made.

67. Gatt also kept Vertex and Tom Wineland informed of its efforts to

land the N.Y.P.D.–SSD as a customer, showed the said partially signed

purchase order to Tom Wineland, executive vice president of Vertex and Jerry

Bradford, Vertex eastern region sales manager, and was congratulated by Mr.

Wineland on "opening the door" for Vertex into New York City business.

22

68. While Gatt still thought that it was going to receive a final purchase order from N.Y.P.D. – SSD for $1,144,960.20, Gatt received a request from Tom Wineland of Vertex that Gatt immediately buy all of the Vertex model 537 radios and equipment which it would need to fulfill such purchase order both to assure Gatt of having these radios in inventory for the earliest possible delivery and also to allow Vertex to report this sale to beef up the approaching Vertex quarterly financial report to its parent company in Japan.

69. At the request of Vertex and Tom Wineland, Gatt purchased the said Vertex model 537 radios and equipment needed to fulfill its quotation to N.Y.P.D. –SSD when the final purchase order was issued at a cost to Gatt of about $700,000.00. Most of the said purchased Vertex radios and equipment were delivered to Gatt and placed in Gatt's inventory in its office.

70. After receiving the said partially signed purchase order from N.Y.P.D.–SSD, however, no fully signed purchase order arrived. Instead, the N.Y.P.D. – SSD first informed Gatt that budget constraints required that the N.Y.P.D.–SSD make a smaller purchase and then that the N.Y.P.D. –SSD would require the re-submission of a new quotation by Gatt or by other parties who could meet the equipment and service specifications mandated by

23

N.Y.P.D.–SSD.

71. As a practical matter, the only persons who could fulfill the specifications mandated by N.Y.P.D. –SSD were Vertex dealers or Vertex itself. After learning of the necessity of having to re-submit a new quotation, Gatt discussed the need for re-submission with PMC Associates, Phillip Casciano, and Vesel Radivic, disclosed to PMC Associates, Phillip Casciano and Vesel Radivic its proposed quotation numbers, and was told by PMC Associates, Phillip Casciano and/or Vesel Radivic: a) "not to worry" since no other New York Vertex dealer  "would be able to submit a quote since Gatt had laid all the ground work" with  N.Y.P.D. –SSD and b) words to the effect that Vertex would arrange matters so that the Vertex home office computer inventory screens  – which each Vertex dealer was supposed to consult before making a quotation or bid to determine if sufficient Vertex radios or equipment was in stock to allow for such quotation or bid – would show that the Vertex model 537 radios necessary to fulfill the proposed N.Y.P.D.-SSD contract were no longer available.

72. In January, 2007, Gatt re-submitted its quotation to N.Y.P.D. – SSD and shortly thereafter learned from either Phillip Casciano or Vesel Radivic

24

that PMC Associates was also submitting a quotation. When Gatt protested to

PMC Associates, Phillip Casciano and/or Vesel Radivic that PMC Associates,

as the manufacture's representative, was not supposed to be bidding directly

against a Vertex dealer and especially that PMC Associates had obtained

Gatt's otherwise privileged bidding information from Gatt and used it to

prepare the PMC Associates bid, Gatt was told by PMC Associates, Phillip

Casciano and/or Vesel Radivic that "It didn't matter who won the contract so

long as Vertex radios were purchased and adopted by N.Y.P.D." and "no

matter who won the contract, PMC would make sure that Gatt got the

commission."

73. Upon information and belief, the quotation submitted by PMC

Associates was based upon the quotation information provided by Gatt to

PMC Associates prior to Gatt's submission and was obtained by PMC

Associates under the guise of giving Gatt advice and counseling in its role as

a Vertex manufacturer's representative.

74. Gatt thereafter further learned from Michael Casciano that instead of

Gatt's receiving a purchase order as expected, PMC Associates' bid had won

the N.Y.P.D. –SSD contract in the form of a purchase order for $245,164.00.

75. At all times relevant hereto, Vertex dealers, such as Gatt, were to be compensated for each sale made of Vertex radios and equipment in the following manner. When the customer confirmed the sale, the sale was reported by the Vertex Sales Representative for the region of the sale – in this case PMC Associates – to Vertex which then billed the customer. Upon payment by the customer to Vertex, Vertex remitted to the dealer which was responsible for the sale a "sales commission" equal to the total cost to the customer of the Vertex radios or equipment sold less the "dealer cost." Although a dealer like Gatt was an independent legal entity, this compensation was still characterized within the Vertex system as a "sales commission." This sales commission was supposed to go to the dealer responsible for initiating and making the sale.

76. In early March, 2007, shortly after PMC Associates obtained the N.Y.P.D.–SSD final purchase order (#PT62497), PMC Associates Michael Casciano faxed a copy thereof to Gatt and Phillip Casciano telephoned Gatt to re-confirm that PMC Associates would be reporting that Gatt was to be recognized as having earned the sales commission on this purchase order even though PMC Associates had been formally awarded the N.Y.P.D.–SSD

contract because Gatt had laid all the groundwork for the sale, because Gatt had done all the work and supplied all the Vertex radios and equipment necessary to persuade the N.Y.P.D.– SSD to invite quotations for Vertex radios and equipment, because Gatt had acquired from Vertex the bulk of the Vertex model 537 radios and equipment necessary to fulfill the N.Y.P.D. – SSD order.

77. Shortly after PMC Associates had re-confirmed Gatt's entitlement to a commission on the N.Y.P.D.–SSD sale, Debbie Allen, an accounts receivable manager of  Vertex contacted Gatt and directed Gatt to turn over the Vertex model 537 radios and equipment which Gatt had bought for itself in anticipation of fulfilling the N.Y.P.D. – SSD order to PMC Associates.

78. Gatt agreed to turn over the Vertex model 537 radios which it had already purchased for Gatt's own use to PMC Associates and forebore in the making of any complaint about the fact that PMC  Associates had won the N.Y.P.D.–SSD contract through the use of Gatt's private quotation information and in direct competition with Gatt, in consideration of the promise by PMC Associates that Gatt – and not PMC Associates – would receive the "sales commission" on the $245, 164.00 sale to N.Y.P.D. – SSD.

79. Since amount of the reduced purchase order awarded to PMC Associates was $245,164.00 representing 275 Vertex radios and equipment, the commission which Gatt would have earned if it had won the purchase order itself was approximately $60,000.00.

80. Gatt was never credited with the full commission promised to Gatt by PMC Associates as aforesaid despite Gatt's repeated demands upon said Debbie Allen of Vertex, PMC Associates and Phillip Casciano therefore.

81. Upon information and belief, PMC Associates and Phillip Casciano reported itself to Vertex as entitled to most of or all of the sales commission for the N.Y.P.D.– SSD order and thereafter improperly received most or all of such sales commission from Vertex which PMC Associates retained for itself.

82. After, Gatt became a Vertex dealer and as part of the Vertex/PMC Associates plan to induce the New York City Police Department to replace existing radios and equipment with Vertex radios and equipment, Gatt was instructed by PMC Associates, Phillip Casciano and Vesel Radivic on several occasions in 2006 and 2007 to participate in the giving of dummy quotations relating to Vertex radios and equipment which the New York City Police Department was considering in order to satisfy the preference expressed in the

28

New York City Procurement Policy Board rules that a New York City

department or agency have more than one proposal, quotation or bid in front

of it before a contract or purchase could be awarded [Section 3-02 (q)].

83. In September, 2005, PMC Associates and Vesel Radivic directed Gatt

to prepare and send a quotation in Gatt's name to the New York City Police

Department (Electronics Section) for a contract of the order of $1,832,332.50

involving the sale of 2000 Vertex model VX-520 mobile radios and radio

supporting equipment.

84. At said time, PMC Associates and Vesel Radivic dictated to Gatt the

unit price amounts to place upon the Gatt quotation sheet and at the same time

made it clear to Gatt that the purpose of such submission was to satisfy the

N.Y.P.D. requirement for the award of any such contract that there be more

than one quotation received by the N.Y.P.D., and to have Gatt bid in such

manner as to facilitate the actual award of such contract to PMC Associates.

It was made clear to Gatt in this instance that Gatt would not be allowed to

actually compete by putting in an independent quotation although Gatt was

fully capable and legally entitled to give such a quotation as a Vertex dealer

because PMC Associates believed itself entitled to win all contracts relating to

the New York City Police Department's purchase of Vertex radios and equipment and this view was, upon information and belief, aided and abetted by Vertex.

85. In making such demand that Gatt file a "dummy quotation," PMC Associates and Vesel Radivic sought to coerce and manipulate Gatt by the threat that since Vertex could revoke Gatt's Vertex dealer's agreement at any time without cause, Gatt had to fully cooperate with PMC Associates and not buck or interfere with PMC Associate's sales system or ambitions.

86. Upon information and belief, the aforesaid September, 2005 effort collusively orchestrated by PMC Associates resulted in the award of a contract for the sale of Vertex radios and equipment to PMC Associates although the quantity of such radios and equipment and the value thereof is not known to Gatt at this time.

87. In February, 2006, PMC Associates and Vesel Radivic directed Gatt to prepare and send a quotation in Gatt's name to the New York City Police Department (Electronics Section) for a contract of the order of $893,179.65 involving the sale of 415 Vertex model VX-5500 mobile radios and radio supporting equipment.

88. At said time, PMC Associates and Vesel Radivic dictated to Gatt the unit price amounts to place upon the Gatt quotation sheet and at the same time made it clear to Gatt that the purpose of such submission was to satisfy the N.Y.P.D. requirement for the award of any such contract that there be more than one quotation received by the N.Y.P.D., and to have Gatt bid in such manner as to facilitate the actual award of such contract to PMC Associates.

89. It was made clear to Gatt in this instance that Gatt would not be allowed to actually compete by putting in an independent quotation although Gatt was fully capable and legally entitled to give such a quotation as a Vertex dealer because PMC Associates believed itself entitled to win all contracts relating to the New York City Police Department's purchase of Vertex radios and equipment and this view was, upon information and belief, aided and abetted by Vertex.

90. In making such demand that Gatt file a "dummy quotation," PMC Associates and Vesel Radivic sought to coerce and manipulate Gatt by the threat that since Vertex could revoke Gatt's Vertex dealer's agreement at any time without cause, Gatt to fully cooperate with PMC Associates and not buck or interfere with PMC Associate's sales system or ambitions.

31

91. Upon information and belief, the aforesaid February, 2006 effort collusively orchestrated by PMC Associates resulted in an award of a contract for the sale of Vertex radios and equipment to PMC Associates although the quantity of such radios and equipment and the value thereof is not known to Gatt at this time.

92. In October, 2006, PMC Associates and Vesel Radivic directed Gatt to prepare and send a quotation in Gatt's name to the New York Police Department (Electronics Section) for a contract of the order of $2,200,000.00 involving the sale of 2500 Vertex model VX-520 radios and radio supporting equipment.

93. At said time, PMC Associates and Vesel Radivic dictated to Gatt the unit price amounts to place upon the Gatt quotation sheet and at the same time made it clear to Gatt that the purpose of such submission was to satisfy the N.Y.P.D. requirement for the award of any such contract that there be more than one quotation received by the N.Y.P.D. and to have Gatt bid in such manner as to facilitate the actual award of such contract to PMC Associates. It was made clear to Gatt in this instance that Gatt would not be allowed to actually compete by putting in an independent quotation although Gatt was

fully capable and legally entitled to give such a quotation as a Vertex dealer because PMC Associates believed itself entitled to win all contracts relating to the New York City Police Department's purchase of Vertex radios and equipment and this view was, upon information and belief, supported, aided and abetted, by Vertex.

94. In making such demand that Gatt file a "dummy quotation," PMC Associates and Vesel Radivic sought to coerce and manipulate Gatt by the threat that since Vertex could revoke Gatt's Vertex dealer's license at any time without cause, Gatt had to fully cooperate with PMC Associates and not buck or interfere with PMC Associates' sales system or ambitions.

95. Upon information and belief, the aforesaid October, 2006 submission of quotations collusively orchestrated by PMC Associates resulted in the award of a contract for the sale of Vertex radios and equipment although the value thereof is not known to Gatt at this time.

96. In April, 2007, PMC Associates directed Gatt to prepare and send a dummy quotation or bid in Gatt's name to the New York City Police Department (Electronics Section) for a contract of the order of $156,000.00 involving the sale of 150 Vertex model VX-537 radios and radio supporting

equipment. Quotations were to be submitted no later than May 1, 2007.

97. At said time, PMC Associates and Vesel Radivic dictated to Gatt the unit price amounts to place upon the Gatt quotation sheet and at the same time made it clear to Gatt that the purpose of such submission was to satisfy the N.Y.P.D. requirement for the award of any such contract that there be more than one quotation received by the N.Y.P.D. and to have Gatt quote in such manner as to facilitate the actual award of such contract to PMC Associates. It was made clear to Gatt in this instance that Gatt would not be allowed to actually compete by putting in an independent quotation although Gatt was fully capable and legally entitled to give such a quotation as a Vertex dealer because PMC Associates believed itself entitled to win all contracts relating to the New York City Police Department's purchase of Vertex radios and equipment and this view was, upon information and belief, aided and abetted by Vertex.

98. In making such demand that Gatt file a "dummy quotation," PMC Associates and Vesel Radivic sought to coerce and manipulate Gatt by the threat that since Vertex could revoke Gatt's Vertex dealer's agreement at any time without cause, Gatt had to fully cooperate with PMC Associates and not

buck or interfere with PMC Associate's sales system or ambitions.

99. Upon information and belief, the aforesaid April, 2007 effort collusively orchestrated by PMC Associates resulted in the award of a contract for the sale of Vertex radios and equipment to PMC Associates although the quantity of such radios and equipment and the value thereof is not known to Gatt at this time.

100. Upon information and belief, PMC Associates, Phillip Casciano and Vesel Ramivic coerced and manipulated one or more other New York State Vertex dealers into helping PMC Associates to secure government contracts for PMC Associates by having such other Vertex dealers and/or Vertex submit dummy quotations or dummy bids to give the appearance that more than just PMC Associates was actually bidding on New York City or County or State contracts and/or that PMC Associates was submitting the most favorable bid to the contracting agency, authority or department.

101. On or about February 27, 2007, The City Of New York Department Of Information Technology & Telecommunications (hereafter "DoITT") put out an invitation for a Competitive Sealed Bid for "Vertex Two-Way Radio Communications Equipment, Services, Parts, Support Equipment and

35

Accessories" to be used primarily by the New York City Police Department.

102. The said DoITT Competitive Sealed Bid effective March 5, 2007 specified that any award could only be made to a licensed Vertex dealer and was given the PIN85807CSB0052 designation for identification.

103. The said DoITT Competitive Sealed Bid was for the award of a contract worth in excess $10,000,000.00 over a five year period to run from May, 2007 to May, 2012 (hereinafter the "DoITT Contract"). The submission of bids for the DoITT Contract was due by April 4, 2007.

104. Gatt received a copy of the "Invitation For Bids Documents" package from DoITT and prepared a bid which it intended to submit to DoITT for consideration via PIN85807CSB9952 on April 4, 2007.

105. As was customary, upon inquiry by PMC Associates, Gatt reported to PMC Associates, Phillip Casciano and Bryan Casciano that Gatt was preparing to bid in response to the DoITT invitation for the DoITT Contract, but when Phillip Casciano and Bryan Casciano learned that Gatt was going to seriously compete for the DoITT Contract, Phillip Casciano and Bryan Casciano told Gatt that Gatt would not be allowed to bid because PMC Associates "was going to bid and win the contract for itself."

36

106. As an inducement to Gatt to not put in any bid, PMC Associates,

Phillip Casciano and Bryan Casciano promised Gatt that Gatt would be the

"principal sub-contractor" on the DoITT Contract after it was awarded and

that Gatt would "make money that way." As with other bids in which Gatt

had been told it was putting a bid in so that PMC Associates would end up

winning, Gatt always had cause to believe PMC Associates was very close to

Vertex, had been given great latitude by Vertex as to how bids and quotes to

government entities in the New York region were to be handled, and had the

power to have Gatt's Vertex dealer's license revoked if Gatt did not fully

cooperate with PMC Associates' scheme.

107. As a result of PMC Associates', Phillip Casciano's and Bryan

Casciano's demand upon Gatt and direction to Gatt to make no bid on the

DoITT contract the only persons to offer a bid for the DoITT Contract were

PMC Associates and Worldwide Electronic Corporation (which entity, upon

information and belief, failed– by design--to put in an actual bid).

108. Upon information and belief, PMC Associates, Philip Casciano

and/or Bryan Casciano induced and coerced Worldwide Electronic

Corporation to list itself as a bidder for the DoITT Contract but Worldwide

Electronic Corporation was in fact merely a "dummy bidder" for purposes of showing that more than one bid had been made.

109. Upon information and belief, the only actual bid made for the DoITT Contract  was the bid of PMC Associates because Worldwide Electronic Corporation, was directed and instructed by PMC Associates, Phillip Casciano and/or Bryan Casciano not to perfect any bid in order to assure PMC Associates of winning the bid for itself.

110. The Invitation for Bids circulated by DoITT to prospective bidders relating to the DoITT Contract required at page 6 in relevant part that:

> Each bid must be submitted upon the prescribed
> form and must contain:
> ...
> (c)  a statement to the effect that it is made without
>      any connection with any other person making the
>      bid for the same purpose and that it is in all respects
>      fair and without collusion or fraud...

111. The said Invitation for Bids required that each such bid was to be made upon the authorized representative of the bidder, was to be verified by the written oath of said authorized representative who signed the bid, and that the several matters stated and information furnished therein were in all

respects true.

112. The Bid Form and ¶ 9.3 of the form Agreement provided in the

Invitation To Bid upon the DoITT Contract, and which, upon information

and belief, PMC Associates ultimately signed with the City Of New York ,

in relevant part:

> The Contractor and each person signing on behalf of any
> contractor warrants and certifies, under penalty of perjury,
> that to the best of its knowledge and belief:
>
> A. The prices in this Contract have been arrived at independently
>    without collusion, consultation, communication, or agreement,
>    for the purposes of restricting competition, as to any matter
>    relating to such prices with any other bidder or with any
>    competitor;
>
> B. Unless otherwise required by law, the prices which have been
>    quoted in this Contract and on the proposal submitted by the
>    Contractor have not been knowingly disclosed by the
>    Contractor prior to the proposal opening, directly or
>    indirectly, to any other bidder or to any competitor; and
>
> C. No attempt has been made or will be made by the Contractor
>    to induce any other person, partnership or corporation to submit
>    or not to submit a proposal for the purpose of restricting
>    competition.

113. PMC Associates bid for the DoITT Contract was successful in

obtaining the award of a contract for a maximum payable amount of

$9,900,000 and was given Contract No. CE-858-20070039068 by DoITT which contract was registered by the Comptroller of the City Of New York on July 10, 2007 and is, upon information and belief, still in force.

114. In May, 2007, Gatt obtained and prepared a bid proposal from the County Of Nassau (Bid Number #9899-05247-051) to be filed by May 24, 2007 for a contract to service, maintain and repair in excess of 200 Vertex VX-800 portable radios as part of the Nassau County Police Department's land mobile two-way radio system.

115. After preparing its bid proposal and preparing to submit its bid to the County Of Nassau, Gatt, upon reporting its efforts to obtain said County Of Nassau contract to Bryan Casciano of PMC Associates was directed by Bryan Casciano either "not to bid at all" or if Gatt had to bid to bid "only at the State Contract price or higher" because PMC Associates wanted "a newly licensed Vertex dealer" on Long Island to "get some of the business."

116. Notwithstanding that Gatt, as a Vertex dealer legally entitled and capable of submitting a bid winning quotation on its own behalf to the County Of Nassau and having considerable experience, expertise and facilities for the service, maintenance and repair of Vertex VX-800 radios

and equipment as required by the bid invitation, Gatt was concerned that if it did not bid as directed by PMC Associates, it could lose its Vertex dealership. Gatt therefore bid as directed after being told that PMC Associates and Revance would make up the other bidders.

117. The winning bidder on the said May, 2007 Nassau County bid was a Long Island dealer called "Revanche" which, as designed by PMC Associates  in advance, was allowed to bid the lowest and won the Nassau County contract which, was for one year's duration with the possibility of up to a further two year, two month extension and could have earned revenues, according to Gatt's projections in excess of $50,000.00.

118. In August, 2007, the New York City Transit Authority advertised for the submission of bids at September 7, 2007 for the sale to the  New York City Transit Authority of 1,200 model ISVX -824-DO-5 (150-174 MHZ) Vertex portable radios, battery charges, leather carrying cases, microphone, 7.2V lithium ion batteries and 1,500 antennas designated as Contract/Bid #73356.

119. Having learned of this solicitation and invitation by the New York City Transit Authority, Gatt obtained a bid package, prepared its bid and

41

submitted it in timely fashion.

120. Said New York City Transit Authority Contract/Bid #73356 was potentially worth in excess of $1,000,000.00 in initial revenues to Gatt, if its bid was successful.

121. Moreover, Gatt or any other winner of Contract/Bid #73356 could anticipate very considerable additional revenues from the sale of Vertex radios and equipment to other New York City agencies, departments and authorities because the grant of a contract of this type by the New York City Transit Authority and the approval of Gatt, as a supplier, would place Gatt upon an approved supplier list and enable and encourage other New York City governmental offices to purchase similar Vertex products upon the same terms without a formal bid process.

122. Gattini initially informed Phillip Casciano of PMC Associates of Gatt's intention to bid on the New York City Transit Authority Contract/ Bid 73356. But Phillip Casciano objected to Gatt's bidding because, as he stated, the "New York Transit Authority is my customer."

123. Thereafter, because of Gatt's belief that PMC Associates had abused and violated its relationship of an advisor to Gatt in PMC Associates' role as

42

the New York State sales representative for Vertex by coercing and manipulating Gatt into foregoing opportunities to bid on valuable government contracts, by failing to arrange for payment to Gatt of promised commissions, by using Gatt information and Gatt dummy bidding to obtain a number of valuable government contracts for PMC Associates, and by dictating and attempting to dictate what kinds of bids Gatt should make, Gatt prepared its submission for the New York City Transit Authority Contract/Bid #73356 without further discussion with PMC Associates and without disclosure to PMC Associates of what Gatt was actually going to do.

124. In September, 2007, Gatt was informed by the New York City Transit Authority that as low bidder for Contract/Bid #73356, Gatt was very likely to be the successful bidder to supply Vertex radios and equipment to the New York City Transit Authority.

125. As stated to Gattini by Phillip Casciano, PMC Associates planned itself to submit a successful bid for Contract/Bid#73356 and actually submitted such a bid.

126. Thereafter, however, when Gatt telephoned PMC Associates to inform PMC Associates that Gatt was likely to be awarded Contract/Bid

#73356 by the New York City Transit Authority, PMC Associates, Phillip Casciano of PMC Associates told Gatt that Gatt had made a "serious mistake" in submitting a bid to the New York City Transit Authority and would suffer financially for it.

127. Thereafter, upon information and belief, when PMC Associates, Phillip Casciano and Tom Wineland discussed and reflected upon the fact that Gatt had failed to coordinate its bidding and marketing activities with PMC Associates as it had been warned to do and put in an independent and competitive bid with the New York City Transit Authority which was likely to result in the award of Contract/Bid #73356 to PMC Associates' loss, Phillip Casciano and PMC Associates reported to Tom Wineland that Gatt had in effect acted against discipline and outside and contrary to the scheme which PMC Associates had established and orchestrated to market and sell Vertex radios and equipment to New York State, County and City agencies, departments and authorities with a minimum of competition and designed to benefit and advantage PMC Associates and Vertex.

128. Thereafter, upon information and belief, PMC Associates and Phillip Casciano reported to Vertex and Tom Wineland that Gatt, by putting in its

own independent bid for Contract/Bid #73356 was a "troublemaker" and had

acted in a manner calculated to injure, undermine and obstruct the efforts and

goals of Vertex and PMC Associates to sell Vertex radios and equipment to as

many New York City agencies, departments and authorities as possible, and

PMC Associates, and Phillip Casciano called for the termination and

revocation by Vertex of the Vertex Gatt Dealers' Agreement.

129. Thereafter, upon information and belief, PMC Associates, Phillip

Casciano and Tom Wineland used their influence and connections with and

within Vertex to cause Vertex to terminate the Vertex Gatt Dealer's

Agreement.

130. Upon information and belief, in seeking to have the Vertex Gatt

Dealer's Agreement terminated, PMC Associates, Phillip Casciano and Tom

Wineland knew that by having the Vertex Gatt Dealer's Agreement

terminated they could prevent Gatt from obtaining award of New York City

Transit Authority Contract/Bid#73356 because the bid specifications required

that no party was eligible to win such contract without being an "authorized"

Vertex licensed dealer.

131. Upon information and belief, in a further effort to eliminate Gatt's

competitive bid for New York City Transit Authority Contract/Bid73356,

PMC Associates and Phillip Casciano  sent a letter to the New York City

Transit Authority stating that Gatt should be disqualified.

132. In a further effort to eliminate Gatt's competitive bid for the New

York City Transit Authority Contract/Bid73356, PMC Associates and

Vesel Radivic contacted Gatt and offered Gatt a "check for $40,000.00" to

withdraw the then existing Gatt bid to the New York Transit Authority.

133. Upon learning that PMC Associates was trying to deter Gatt from

pursuing its bid to the New York Transit Authority and to unlawfully induce

Gatt to continue as a part of an illegal scheme to limit and coordinate bids to

New York City agencies, departments and authorities either by threat or by

pay-off, Gattini complained of PMC Associate's efforts directly to Tom

Wineland of Vertex. But instead of taking any action to check PMC

Associates from further efforts to force Gatt to give up its independent bid,

Tom Wineland told Gattini that it was very much in Gatt's interest to

promptly "take the money" from PMC Associates.

134. Upon information and belief, in seeking to have the Vertex Gatt

Dealer's Agreement terminated by Vertex, PMC Associates, Phillip Casciano,

Vesel Radivic, Bryan Casciano and Tom Wineland  intended to punish and

penalize Gatt and to retaliate against Gatt for having dared to make an

independent and competitive bid in defiance of and contrary to PMC

Associate's system of controlling bids and quotations and in retaliation for

the making by Gatt of an independent and competitive bid and well as in

retaliation for earlier protests by Gatt to PMC Associates and/or Vertex that

Gatt was not being allowed to bid on lucrative governmental contracts and

had not been paid what it was owed for commissions.

135. Upon information and belief in seeking to have the Vertex Gatt

Dealer's Agreement terminated by Vertex, PMC Associates, Phillip Casciano,

Vesel Radivic, Bryan Casciano and Tom Wineland intended and hoped : a) to

eliminate any threat that Gatt posed to the continuation of the collusive

bidding system being orchestrated by PMC Associates with the knowledge,

support and approbation of Vertex, and thereby to eliminate all Gatt

competition; b) that PMC Associates would become the successful bidder for

New York City Transit Authority Contract/Bid#73356, or if the New York

City Transit Authority decided to cause a re-bid for the same or similar Vertex

radios and equipment, for the contract on the said re-bidding, because PMC

Associates had been controlling, dominating and manipulating the bidding of New York State dealers upon New York City government contracts and believed that its system of bidding control, with the elimination of Gatt, would still remain intact.

136. In seeking to terminate the Vertex Gatt Dealer's Agreement, Vertex and Tom Wineland knew that said termination would render Gatt ineligible to be the winning bidder on Contract/Bid #73356 and that the exclusion of Gatt from the bidding on Contract/Bid #73356 or on any subsequent re-bidding of such contract would eliminate competition in any such bidding.

137. Upon information and belief, in seeking to terminate the Vertex Gatt Dealer's Agreement, Tom Wineland, Phillip Casciano, Vesel Radivic and Bryan Casciano knew that said termination of license would render Gatt ineligible to be the winning bidder on Contract/Bid #73356, that Gatt would lose all of the benefit that it might obtain by the award of Contract/Bid #73356 to Gatt, that Gatt would not be able to bid upon any re-bid of Contract/Bid #73356, and that Gatt would no longer be able to sell Vertex radios and equipment to anyone (which at that point were becoming

increasingly accepted and utilized by governmental organizations and private

industry in New York State in part because of the diligent marketing efforts of

Gatt) without having to buy such radios and equipment at market price.

138. Upon information and belief in seeking to terminate the Vertex

Gatt Dealer's Agreement, Tom Wineland and one or more other persons,

were party to and privy to PMC Associates' scheme for the control and

manipulation of bidding to New York State, County and City government

agencies, knew that Gatt had acted contrary to that system and in defiance of

PMC Associate's instructions and control, and Tom Wineland, and one or

more other persons, acted to terminate the Vertex Gatt Dealer's Agreement in

retaliation and in punishment for the failure of Gatt to remain compliant and

obedient.

139. On October 22, 2007, upon information and belief, at the insistence

of and upon the denunciation of Gatt by PMC Associates and Phillip

Casciano, Vertex gave Gatt a notice of termination of the Gatt Vertex Dealer's

Agreement.

140. Upon information and belief, the termination of the Gatt Vertex

Dealer's Agreement to eliminate the risk posed by Gatt's direct competition

and in retaliation for Gatt's failure to continue to stay within the bounds of

and to participate in the scheme instituted and orchestrated by PMC

Associates, and one or more other persons, for the framing and submission of

bids on Vertex radios and equipment to New York State government entities

was done notwithstanding that both PMC Associates, Phillip Casciano,

Tom Wineland and one or more other persons knew that the aforesaid scheme

and operation were unlawful and collusive with respect to the elimination and

suppression of competition.

141. Upon information and belief, in part as a result of PMC

Associates' and Phillip Casciano's improper and unlawful denunciation of

Gatt and because of the termination of the Gatt Vertex Dealer's Agreement

instigated by PMC Associates and Phillip Casciano and concurred in by

Tom Wineland, and one or more other persons, the New York City Transit

Authority caused Contract/ Bid#73356 to be re-bid as Contract/Bid#73669 in

October, 2009.

142. As a result of the termination of the Gatt Vertex Dealer's

Agreement, Gatt was no longer eligible to bid upon or to receive an award

upon New York City Transit Authority Contract/Bid#73356 and/or

Contract/Bid#73669 to sell Vertex radios and equipment to any New York State government agency to the very great financial loss of Gatt.

143. As a result of the termination of the Gatt Vertex Dealer's Agreement, Gatt was no longer able to sell Vertex radios or equipment to any New York State private company or organization or to service or maintain Vertex radios or equipment which Gatt had already sold to private companies or organizations without being obliged to purchase such radios and equipment in the open market at a disadvantageous price to the very great financial loss of Gatt.

144. As a result of the termination of the Gatt Vertex Dealer's Agreement, as aforesaid, Gatt's revenues in 2008 for sales of Vertex radios and equipment fell over ninety per cent from its revenues for 2007 prior to the said termination of the Gatt Vertex Dealer's Agreement.

145. PMC Associates was one of the bidders on the re-bidding by the New York City Transit Authority but that the bidding was organized in such collusive manner that PMC Associates was successful in obtaining the award of contract from the New York City Transit Authority.

146. Upon information and belief, ¶G of the Bid form submitted by

PMC Associates in connection with New York City Transit Authority re-bid

Contract/Bid No. 73669 contained the representations required in all such

bids by §2878 of the Public Authorities Laws of the State of New York as

set out hereinafter in paragraph 159 below and PMC Associates was obliged

to make such representations in order to make re-bid Contract/Bid No. 73669

and to secure the award of such contract thereafter.

147. At all times relevant hereto, the agencies, departments and

authorities of New York City's government represented a prime potential

market for the sale by the Plaintiff of Vertex radios and equipment because

such agencies, departments and authorities not only had the wherewithall to

buy large quantities of Vertex products but also because such agencies,

departments and authorities represented on-going sources of substantial

business to Plaintiff both from a sales and servicing point of view. Moreover,

once Plaintiff had been recognized and certified as an appropriate source of

such sales and services by one agency or department, it greatly increased the

likelihood of the Plaintiff's being able to make sale and to provide service to

other agencies and departments.

148. Upon information and belief, from the middle of 2003 to the

present no contract for the sale, supply or servicing of Vertex radios or

equipment of any significance has been awarded by a New York City agency

or department or authority to anyone but PMC Associates notwithstanding

that there have been during this period at least  eight New York State licensed

Vertex dealers, including the Plaintiff, who were legally entitled and capable

of selling or supplying or servicing Vertex radios and equipment to New

York City government.

149. In order to maximize the possibility of selling to New York

City government entities such as the New York City Police Department and

New York Transit Authority, PMC Associates, John Doe, Henry Hoe and

Richard Roe, with the knowledge, support and encouragement of Vertex,

coerced and manipulated Gatt into helping PMC Associates, John Doe, Henry

Hoe and Richard Roe into rigging bids, fixing prices and allocating markets in

New York, and Gatt was threatened with the loss of its Vertex Gatt Dealer's

Agreement if it refused to cooperate in the scheme or system which PMC

Associates was engaged in.

150. On occasions when Gatt sought to freely compete for business,

Gatt's opportunity to obtain such business was obstructed, foreclosed

and/or appropriated by PMC Associates and Phillip Casciano and one or more of the other Defendants either by violation by PMC Associates of its confidential relationship with Gatt or by direction to Gatt not to compete upon penalty of loss of dealership agreement or by the inducing of Gatt or by the attempting to induce Gatt not to participate with the false promise of some future inclusion in a contract upon which PMC Associates was seeking the inside tract, and/or by the promise of cash or commission payment and/or by the sequestration and manipulation of the Vertex warehouse radio and equipment inventory so as to prevent Gatt from being able to participate in or to fulfill a contemplated quotation or bid.

151. When Gatt complained to PMC Associates or Vertex about the restrictions being placed upon its ability to compete freely for New York City contracts and when Gatt independently submitted a bid to obtain a large New York City Transit Authority Contract, which was perceived by PMC Associates, Phillip Casciano, Bryan Casciano and Vesel Ramovic, as endangering the bid rigging scheme being orchestrated by PMC Associates, Vertex, at the behest of PMC Associates, and with the knowledge direct action,  and involvement of Tom Wineland, unlawfully terminated the Vertex

Gatt Dealer's Agreement so that Gatt could no longer be the recipient of a contract award upon its apparently successful bid with the New York Transit Authority or upon any re-bid of such contract.

152. The relationship between PMC Associates, Tom Wineland, Phillip Casciano, Bryan Casciano, Vesel Ramovic, and one or more other persons, andthe acts and activities of these Defendants, as aforesaid in orchestrating, arranging, manipulating and rigging bidding over an extended period to gain sales of Vertex radios and equipment to New York City constituted an unlawful combination and conspiracy to limit and coerce the manner in which licensed Vertex dealers could seek the business of the City of New York and other New York State government agencies. This in turn resulted in a per se unreasonable restraint of trade in the sale of Vertex radios and equipment in New York.

153. The effort to have of the Vertex Gatt Dealer's Agreement, terminated, as aforesaid, was undertaken by PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic, Tom Wineland, and one or more other persons, and designed to protect and further the said conspiracy, to interfere with any competition which Gatt was seeking to provide to Vertex,

55

PMC Associates or other New York State licensed Vertex dealers in the sale of Vertex radios and  equipment to agencies, departments and authorities of New York City, and to try to ensure that PMC Associates would continue as either the exclusive provider of Vertex radios and equipment or the entity which had the power to determine who would provide Vertex radios and equipment to governmental agencies, departments and authorities of New York City. It was also a retaliatory act taken against Gatt.

154. In inducing, coercing, manipulating or requiring Gatt to engage in dummy bidding, in discussing with Gatt quotations, proposals and bids that Gatt was engaged in or was considering to be engaged in, in utilizing information obtained from Gatt about Gatt's quotations, proposals or bids for the preparation of PMC Associates' quotations, proposals or bids, and in inducing, coercing, manipulating or requiring Gatt not to participate in rendering quotations or bids, all as aforesaid, and in arranging for the termination of the Gatt Vertex Dealer's Agreement, PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic, Tom Wineland, and one or more other persons, were engaged in the arrangement, manipulation and rigging of quotations to and bidding upon the sale of Vertex radios and Vertex

equipment to the New York City Police Department and to the New York City Transit Authority in a manner which was unlawful and which violated Section 1 of the Sherman Act and Section 4 of the Clayton Act.

155. Upon information and belief, in inducing, coercing, manipulating or requiring one or more New York State Vertex licensed dealers other than Gatt to engage in dummy bidding, to reveal and discuss the quotations, proposals and bids of said other Vertex dealers, in utilizing information obtained from said other Vertex dealers for the preparation of PMC Associates' own quotations, proposals or bids and/or in inducing, coercing, manipulating or requiring said other Vertex dealers not to participate in rendering quotations or bids, PMC Associates, Phillip Casciano, Bryan Casciano, and Vesel Ramovic were engaged in collusion, manipulation and rigging of quotations for and bidding upon the sale of Vertex radios and Vertex equipment to the New York City Police Department and to the New York City Transit Authority in a manner which was unlawful and which violated Section 1 of the Sherman Act and Section 4 of the Clayton Act.

156. Upon information and belief, at all times relevant hereto, Tom Wineland and Vertex knew about the collusive, manipulative and

rigged manner in which PMC Associates, Phillip Casciano, Bryan Casciano and Vesel Ramovic was organizing, arranging and orchestrating quotations, proposals and bids for the sale of Vertex radios and equipment to the New York City Police Department and New York City Transit Authority and Vertex supported and encouraged such unlawful activity.

157. As a result of anti-competitive acts and unlawful collusion on the part of PMC Associates, Phillip Casciano, Bryan Casciano, Tom Wineland, Vesel Ramovic, and one or more other persons, Gatt was deprived of being able to freely and competitively bid by which it would have been able to obtain a sales commission in excess of $50,000.00 in connection with its quotation to the N.Y.P.D.–SSD in 2006 as aforesaid and subsequent sales by PMC Associates to the N.Y.P.D.–SSD.

158. As a result of the anti-competitive acts and unlawful collusion on the part of PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic, Tom Wineland, and one or more other persons, and especially the unlawful termination of the Gatt Vertex Dealer's Agreement as aforesaid, Gatt was deprived of its opportunity and right to freely and competitively

conclude the bidding and to be able to earn a commission in excess of $170,738.40 in connection with the award of Contract/Bid 73356 by the New York City Transit Authority in fall, 2009 or to freely and competitively bid upon New York City Transit Authority relating to Contract/73669 which constituted the re-bidding of Contract/Bid 73356 and to earn a commission thereupon in excess of $170,000.00.

159. As a result of the anti-competitive acts and unlawful collusion on the part of PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic, Tom Wineland and one or more other persons, and especially the wrongful retaliatory termination of the Gatt Vertex Dealer's Agreement,  as aforesaid, Gatt was deprived of and lost its ability and opportunity to continue to sell Vertex radios and equipment in New York State and its gross revenues plummeted, because of its inability to sell such products from $784,000.00 in 2007 to $30,000.00 in 2008.

160. As a result of the anti-competitive acts and unlawful collusion on the part of PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic, Tom Wineland, and one or more other persons, and especially the wrongful retaliatory termination of the Gatt's Vertex Dealer's Agreement, as

aforesaid, Gatt was deprived of and lost its ability and opportunity to continue to sell Vertex radios and equipment in New York State and its gross revenues to date in 2009 are a fraction of what they were in 2007.

161. As a result of the anti-competitive acts and unlawful collusion on the part of PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramivic, Tom Wineland, and one or more other persons, and especially the wrongful retaliatory termination of the Gatt's Vertex Dealer's Agreement, as aforesaid, Gatt suffered and is suffering damages in excess of $1,000.000.00.

162. Gatt is a person having "antitrust standing" pursuant to §4 of the Clayton Action both by virtue of being an entity "injured in its business or property by reason of ...(acts)... forbidden in the antitrust law" and by virtue of having suffered damage directly in connection with a necessary step taken by the Defendants to restrain competition and of having suffered damage through the very means by which Defendants sought to restrain competition.

163. Gatt, as a competing Vertex dealer, was and is a person having "antitrust standing" pursuant to §4 of the Clayton Act because, inter alia, both its attempt to prosecute a competitive (and apparently winning) bid and the continuance of its business was thwarted by the Defendants in furtherance

of preserving a conspiracy to harm competition.

164. Gatt's injury constitutes an "antitrust injury" in that it is attributable to an anticompetitive aspect of the bid-rigging practice under scrutiny and because at the same time Gatt's injury flows from the alleged harm to the market.

165. The damages complained of by Gatt were directly and proximately caused by the Defendants in connection with the Defendants acts and scheme to restrain competition in bidding to New York City and Nassau County government entities.

166. As a result of the aforesaid acts and actions of the Defendants in causing damage to Gatt, Defendants should be held liable to Gatt in amount in excess of $1,000,000.00 together with treble damages and reasonable attorneys' fees.

## AS AND FOR A SECOND COUNT
## AGAINST ALL OF THE DEFENDANTS
### (New York State Anti-Trust Violation)

167.    Plaintiff repeats and realleges each and every allegation made heretofore herein as if set out herein in full and with the same force and effect.

168.  §340 of the General Business Law of the State of New York

provides in relevant part:

> 1. Every contract, agreement, arrangement, or combination whereby a monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby
>
> Competition or the free exercise of any activity in the conduct of business, trade or commerce or in the furnishing of any service in this state is or may be restrained or whereby
>
> For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise or any activity in the conduct of any business, trade or commerce or the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void.
>
> ...
>
> 5. ...any person who shall sustain damages by reason of any violation of this section, shall recover three-fold the actual damages sustained thereby, as well as costs not exceeding ten thousand dollars, and reasonable attorneys' fees.

169. §2878 of the Public Authorities Law of the State of New York

states in relevant part:

> Every bid or proposal hereafter made to a public authority or to any official of any public authority

62

created by the state or by any political subdivision, where competitive bidding is required by statute, rule, regulation or local law, for work or services performed or to be performed or goods sold or to be sold, shall contain the following statement subscribed by the bidder and affirmed by such bidder as true under the penalties of perjury: Non-collusive bidding certification.

"(a) By submission of this bid, each bidder, and each person signing on behalf of any bidder certifies, and in the case of a joint bid each party thereto certifies as to its own organization , under penalties of perjury, that to the best of his knowledge and belief:

(1) The prices in this bid have been arrived at independently without collusion, consultation, communication or agreement, for the purpose of restricting competition, as to any matter relating to such prices with any other bidder or with any competitor;

(2) Unless otherwise required by law, the prices which have been quoted in this bid have not been knowingly disclosed by the bidder and will not be knowingly disclosed by the bidder prior to opening, directly or indirectly, to any other bidder or to any competitor; and

(3) No attempt has been made or will be made by the bidder to induce any other person, partnership or corporation to submit or not to submit a bid for the purpose of restricting competition"

(b) A bid shall not be considered for award nor shall any award be made where (a)(1)(2) and (3) above have not been complied with...

170.  As aforesaid, the acts, actions and activities of PMC Associates,

Phillip Casciano, Bryan Casciano, Vesel Ramovic, Tom Wineland and one or more other persons, between January 1, 2007 and December 31, 2007 constituted and constitute a combination, reciprocal relationship and/or conspiracy between PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic, Tom Wineland, and one or more other persons to engage in bid-rigging, manipulation of quotations and bids, manipulating inventory and market allocation for the award of contracts for the purchase of Vertex radios and equipment by departments, agencies and authorities of the City of New York.

171. The manner in which PMC Associates and one or more of the other Defendants participated in the aforesaid bidding for the sale of Vertex radios and equipment to the New York City Police Department and New York City Transit Authority also violated §2878 of the New York State Public Authorities Law.

172. As aforesaid, the acts, actions and activities of PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic, Tom Wineland and one or more other persons between January 1, 2006 and December 31, 2007 had the object of and the effect of limiting and restraining the ability and capacity

of Gatt and other individual holders of Vertex licenses from engaging in free competition and bidding for the award of contracts for the purchase of Vertex radios and equipment by departments, agencies and authorities of the City of New York, and in particular with respect to the New York City Police Department, to the New York City Transit Authority and with respect to the New York City Department Of Information Technology And Telecommunications (DoITT).

173.    As aforesaid, the act of terminating the Gatt Vertex Dealer Agreement to thwart Gatt's attempted effort to freely compete for the award of a contract for the purchase of Vertex radios and equipment was an act in furtherance of such unlawful scheme, combination and arrangement to rig the bidding on the supply of Vertex radios and equipment to the City of New York and had the effect not only of virtually putting Gatt out of business but also of eliminating Gatt as a competitor who was prepared to offer better prices to agencies, departments and authorities of the City Of New York for the purchase of Vertex radios and equipment if Gatt was allowed to exist and operate outside of said bid rigging scheme, arrangement and combination.

174. The aforesaid acts of PMC Associates, Phillip Casciano, Bryan

Casciano, Vesel Ramovic and Tom Wineland, and one or more other persons, on the one hand, in depriving Gatt of being able to make independent and bona fide bids to earn commissions on the sales of or servicing and maintenance Vertex radios and equipment while on the other eliminating Gatt as a Vertex dealer resulted in the loss to Plaintiff of potential commissions and earning in excess of $1,000,000.00.

175. The aforesaid acts of PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic and Tom Wineland, and one or more other persons, in causing damage and financial injury to Gatt were taken as a necessary step or necessary steps in the furtherance of a scheme to minimize and restrict competition with respect to the quotation or bidding upon awards and contracts of government agencies, authorities and departments of the City of New York. and such damages to Gatt were proximately caused by said acts of the Defendants.

176. PMC Associates, Phillip Casciano, Bryan Casciano, Vesel Ramovic and Tom Wineland should be held liable to Gatt in an amount in excess of $1,000,000.00, together with treble damages, the costs hereof and reasonable attorneys' fees.

## AS AND FOR A THIRD COUNT
## AGAINST ALL OF THE DEFENDANTS
## (CIVIL RICO)

177. Plaintiff repeats and realleges each and every allegation made

heretofore herein as if set out herein in full and with the same force and effect.

178. Title 18 U.S.C. §1962 provides in relevant part:

(a) It shall be unlawful for any person who has received
any income derived, directly or indirectly, from a pattern of
racketeering activity or through collection of an unlawful debt...
to use or invest, directly or indirectly, any part of such income,
or the proceeds of such income, in acquisition of any interest in,
or the establishment or operation of, any enterprise which is
engaged in, or the activities of which affect, interstate or foreign
commerce....

(b) It shall be unlawful for any person through a pattern of
racketeering activity or through collection of an unlawful debt
to acquire or maintain, directly or indirectly any interest in or
control of any enterprise which is engaged in, or the activities
of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or
associated with any enterprise engaged in, or the activities of
which affect, interstate or foreign commerce, to conduct or
participate, directly or indirectly, in the conduct of such
enterprise's affairs through a pattern of racketeering activity
or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any
of the provisions of sub sections (a), (b) or (c) of this section.

179. 18 U.S.C. §1961(1) provides in relevant part:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

180. 18 U.S.C. §   defines racketeering activity" to mean:

(B) any act which is indictable under any of the following provisions of title 18, United States Code: ...section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) ...

181. 18 U.S.C. §1341 makes it a criminal offense for anyone who:

...having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing....

182. 18 U.S.C. §1343 makes it a criminal offense for anyone who:

...having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire...in interstate or foreign commerce, any writings, signs, signals,

pictures or sounds for the purpose of executing such scheme
or artifice....

183. As above pleaded and alleged, upon information and belief,

from at least the middle of 2005 onwards, PMC Associates, Phillip

Casciano, Vesel Ramivic, Tom Wineland and one or more other persons

developed an unlawful scheme by which it was planned and intended to

circumvent competitive bidding procedures of the agencies, authorities and

departments of New York City and other governmental subdivisions of the

State Of New York by rigging, manipulating and "arranging" bids in order to

obtain for PMC Associates and Phillip Casciano all contracts or awards to

purchase Vertex radios and equipment and/or to give PMC Associates and

Phillip Casciano the power to allocate those awards and contracts as PMC

Associates saw fit.

184. Upon information and belief, for most of the time that said

unlawful scheme was in the planning or being implemented, Tom Wineland

and one or more other persons either participated directly in such unlawful

scheme and/or had knowledge of such unlawful scheme, approved of and

supported such unlawful scheme and took action to further the

69

implementation of such unlawful scheme.

185. Upon information and belief, the unlawful scheme involved, inter alia, face-to-face meetings, correspondence or discussions between Phillip Casciano, Vesel Ramivic and one or more other employees of PMC Associates and/or Tom Wineland and one or more other employees of Vertex by which other New York State Vertex dealers were given prices "to clear" or "to protect" and either submitted complementary bids or did not bid at all on a number of bids advertised by a New York City agency, authority or department.

186. In order to implement and effectuate such unlawful scheme it was necessary for PMC Associates, Phillip Casciano, Vesel Ramivic, Bryan Casciano, Michael Casciano, Tom Wineland, or John Doe, Richard Roe and Henry Hoe to regularly make interstate mailings and to make telephone calls and to send interstate faxes and eMails between themselves and various governmental entities.

187. In order to implement and effectuate such unlawful scheme it was necessary for PMC Associates, Phillip Casciano, Vesel Ramivic, Bryan Casciano, Michael Casciano, Tom Wineland, and/or John Doe, Richard Roe

and Henry Hoe to regularly use and to re-invest monies obtained through and

by such unlawful interstate scheme to further and to enlarge the  operation and

reach of such unlawful scheme or enterprise and to impose its baleful affect

upon interstate commerce.

188. In an effort to implement and maintain such unlawful scheme it

was also necessary for PMC Associates, Phillip Casciano, Vesel Ramivic,

Bryan Casciano and Tom Wineland to make interstate telephone calls and

send interstate mail and faxes to try to promote compliance with or to enforce

discipline under such unlawful scheme or enterprise.

189. In and about September 25, 2005 Vesel Ramivic participated in

two or more telephone calls between New York City and Hazlet, New Jersey

for the purpose of dictating to Dave Moran of Gatt a quotation for submission

to the New York City Police Department (Electronics Section) for award of a

contract for purchase of 2000 Vertex VX-520 UD radios and associated

equipment in an arranged manner which would enable PMC Associates to

make a winning bid as an on-going part of the aforesaid bid-rigging scheme.

Within several weeks thereafter, upon information and belief, PMC

Associates, by one or more of the Defendants, sent one or more faxes, eMails

or letters containing PMC Associates own bid and relating to such bidding from New Jersey to the New York City Police Department (Electronics Section) in New York, all in furtherance of said rigged bidding scheme or enterprise.

190. In and about February 21, 2006, Vesel Ramivic participated in two or more telephone calls between Hazlet, New Jersey and New York City for the purpose of dictating to Dave Moran of Gatt a quotation for submission to the New York City Police Department (Electronics Section) for award of a contract for purchase of 415 Vertex VX5500 UD radios and associated equipment in an arranged manner which would enable PMC Associates to make the winning bid and as an on-going part of the aforesaid bid-rigging scheme. Upon information and belief, within several weeks thereafter, PMC Associates, by one or more of the Defendants, sent one or more faxes, eMails or letters, from New Jersey to the New York City Police Department (Electronics Section) containing PMC Associates' own bid or relating to said bidding, all in furtherance of said bid-rigging scheme or enterprise.

191. In and about October 18, 2006, Vesel Ramivic participated in two or more telephone calls between Hazlet, New Jersey and New York City for

the purpose of dictating to Dave Moran of Gatt a quotation for submission to the New York City Police Department (Electronics Section) for award of a contract for purchase of 2500 Vertex VX520 UD radios and associated equipment in an arranged manner which would enable PMC Associates to make a winning bid and as an on-going part of the aforesaid bid-rigging scheme. Upon information and belief, within several weeks thereafter, PMC Associates, by one or more of the Defendants, sent one or more faxes, eMails or letters from New Jersey to the New York Police Department (Electronics Section) in New York containing PMC Associates' own bid or relating to such bidding, all in furtherance of said rigged bidding scheme or enterprise.

192. In and about April 24, 2007, Vesel Radivic participated in two or more telephone calls between Hazlett, New Jersey and New York City for the purpose of dictating to Gattini of Gatt a quotation for submission to the New York City Police Department (Electronics Section) for award of a contract for the purchase of 150 Vertex 537 radios and associated equipment in an arranged manner which would enable PMC Associates to make a winning bid and as an on-going part of the aforesaid bid-rigging scheme. Upon information and belief, within several weeks thereafter, PMC

Associates, by one or more of the Defendants, sent one or more faxes, eMails or letters from New Jersey to the New York City Police Department (Electronics Section) in New York containing PMC Associates' own bid or relating to such bidding, all in furtherance of said rigged bidding scheme or enterprise.

193. In the period February to July, 2007 Phillip Casciano and/or Bryan Casciano and/or one or more of the other Defendants participated in multiple telephone calls and sent and received a number of letters, faxes and/or eMails between Hazlet, New Jersey and DoITT and/or one or more New York Vertex dealers in New York State and between Hazlet, New Jersey and Tom Wineland or other employee of Vertex in the State Of California and/or the State of Texas and/or other state in which Tom Wineland was then located in order to fix and to arrange a bid for the DoITT contract No. CE-858-20070039068 won by PMC Associates as part of the aforesaid on-going bid-rigging scheme. In addition, in support of said bid, a letter of recommendation for PMC Associates was sent by Vertex from the State Of California to DoITT in New York City.

194. In addition, in April, 2007, Phillip Casciano and/or Bryan

74

Casciano, in an effort to induce Gatt not to bid independently and competitively on the said DoITT contract made one or more telephone calls from New Jersey to New York to tell Gattini that if Gatt did not bid, Gatt would become the "principal sub-contractor" on any contract awarded and would "make money that way." This telephonic offer was made by Phillip Casciano and/or Bryan Casciano in furtherance of the aforesaid on-going bid-rigging scheme.

195. In addition, upon information and belief, in February, March or April of 2007, Phillip Casciano and/or Bryan Casciano and/or another employee of PMC Associates made two or more telephone calls and/or sent one or more faxes and/or eMails from New Jersey to New York to Worldwide Electronic Corporation (a New York Vertex dealer) on several occasions to arrange with said Worldwide Electronic Corporation to put its name forward to and as a bidder on said DoITT contract but not to actually submit a bid in furtherance of the aforesaid on-going bid-rigging scheme or enterprise.

196. In May, 2007, Bryan Casciano made or participated in one or more telephone calls from New Jersey to New York to Gattini when PMC Associates learned that Gatt was considering making a bid to the County Of

Nassau, New York for a contract to service, maintain and repair in excess of 200 Vertex VX-800 portable radios as part of the Nassau County Police Department's land mobile two-way radio system.

197. In the said telephone call or telephone calls between Bryan Casciano and Gattini, Bryan Casciano directed Gatt "not to bid at all" on the said Nassau County contract or if Gatt had to bid to bid "only at the State Contract price or higher" so that PMC Associates could reward another New York Vertex dealer with the contract. Such telephone conversation and such direction was made by Bryan Casciano in furtherance of the aforesaid on-going bid-rigging scheme or enterprise.

198. As already alleged, from at least 2004, Gatt was active in trying to generate interest on the part of the N.Y.P.D. – SSD in the use and purchase of Vertex radios and equipment and Gatt expended much energy, time and its own money in trying to promote Vertex products and to educate the N.Y.P.D. – S.S.D. in the value and superior effectiveness of Vertex products.

199. As a result of its efforts with the N.Y.P.D. – SSD, Gatt was invited in July, 2006 to give a quotation for the award of a contract by the N.Y.P.D. – SSD and in response Gatt submitted a quotation which resulted in

the N.Y.P.D. giving to Gatt a partially signed purchase order thereafter.

200. In the summer/fall of 2006 in connection with the preparation and submission of its said quotation, a number of telephone conversations between Phillip Casciano and Vesel Radivic in New Jersey and Gattini and one or more of Gatt's other employees in New York were held and several faxes were sent by Gatt in New York and received at PMC Associates in Hazlet, New Jersey to report to PMC Associates, as requested and required by PMC Associates, the terms of Gatt's quotation and the progress which Gatt believed it was making towards obtaining a winning award from N.Y.P.D.– SSD.

201. When it was learned by Gatt, after Gatt had been informed by N.Y.P.D.– SSD unofficially that it was likely to win a contract, that N.Y.P.D. – SSD had decided to re-bid its proposed contract because of budgetary constraints, Gattini in New York and Phillip Casciano and Vesel Radivic in New Jersey held a number of telephone calls and one or more faxes were sent between Gatt in New York and PMC Associates in New Jersey for the purpose of discussing in detail the quotation which Gatt proposed to re-submit.

202. At the time that said telephone calls and faxes were being exchanged between Gatt and PMC Associates, Phillip Casciano and Vesel Radivic planned and intended to use the knowledge of Gatt's earlier quotation and proposed quotation to craft PMC Associate's own quotation to the N.Y.P.D. –SSD in a manner which would make it more attractive to N.Y.P.D. – SSD than Gatt's quotation and would win the award for PMC Associates. In said telephone conversations, Phillip Casciano and Vesel Radivic failed to disclose such intention to Gatt and in the guise of pretending to help Gatt gave encouragement to Gatt and reassurances to Gatt that Gatt's quotation would prevail. The said interstate telephone calls and faxes between PMC Associates and Gatt, which were generated as a result of the insistence by PMC Associates that Gatt report in detail its marketing activities and prospects as a Vertex dealer, were used by PMC Associates in furtherance of the aforesaid and on-going unlawful enterprise designed to achieve the goal of either garnering for PMC Associates all contracts to be awarded by New York City government entities for Vertex radios and equipment or allowing PMC Associates to dictate to which  dealer any given contract should go.

203. As a direct consequence of the exchange of interstate telephone

calls and faxes between PMC Associates and Gatt, PMC Associates's

quotation won the award of the N.Y.P.D. – SSD contract for $245,164.00 and

Gatt failed to win such award as shown by a fax sent by Phillip Casciano

and/or Michael Casciano to Gatt on May 23, 2007 of the N.Y.P.D. – SSD

purchase order to PMC Associates.

204. As already alleged, in August, 2007, the New York City Transit

Authority advertised for the submission of bids at September 7, 2007 for the

purchase of 1,200 model ISVX-824-DO-5 Vertex portable radios and

accessories (Contract/Bid #73356).

205. After beginning to prepare the Gatt bid, Gattini in New York and

Phillip Casciano in New Jersey held a telephone conversation in which Gatt

reported its intention to bid upon the New York City Transit contract and

Phillip Casciano told Gattini that Gatt could not bid because the "New York

City Transit Authority is my customer" and PMC Associates was "going to

submit a winning bid."

206. Notwithstanding Phillip Casciano's objection, Gatt, without

disclosure to PMC Associates of the terms of the Gatt bid, submitted its

bid and in September, 2007, Gatt was informed by the New York City

79

Transit Authority that as low bidder for Contract/Bid #73356, Gatt was very likely to be the successful bidder.

207. In September, 2007, shortly after learning that Gatt was the likely winner of the said bidding to the New York City Transit Authority on Contract/Bid #73356, Gattini in New York and Phillip Casciano in New Jersey held one or more telephone conversations in which Gattini informed Phillip Casciano of Gatt's success in said bidding and Phillip Casciano told Gattini that "we know all about it" and that in making and winning such a contract, Gatt had made a "serious mistake" and would "suffer financially" for having done so and Gatt should "walk away from the contract."

208. Thereafter, upon information and belief, Phillip Casciano in New Jersey and Tom Wineland in California and/or Texas and/or some other state outside New York held several telephone conversations and/or exchanged several eMails in which Phillip Casciano reported to Tom Wineland that Gatt had "acted on its own" and made an independent bid for the New York City Transit Authority Contract/Bid #73356 outside of the on-going bid rigging enterprise being orchestrated by PMC Associates which was likely to get Gatt the award instead of the award going to PMC Associates.

209. Upon information and belief, Phillip Casciano in said telephone calls and/or eMails made demands upon Tom Wineland to have Vertex act as soon as possible to terminate the Vertex Gatt Dealer's Agreement so as to make Gatt ineligible to win an award from the New York City Transit Authority which could only be given to an authorized Vertex dealer since that would allow PMC Associates, with the arranged bidding of Vertex and a New York Vertex dealer called Worldwide Electronics Corporation, to win the Contract/Bid #73356 and at the same time make sure that no other New York State dealer got ideas about trying to undercut PMC Associates' arranged bidding program by independent (and competitive) action.

210. Upon information and belief, Phillip Casciano and Tom Wineland also in said telephone conversations or eMails discussed if there was some other way short of termination of getting Gatt to withdraw of its own from the bidding.

211. On or about October 8, 2007, after said telephone calls and/or the exchange of eMails, between Phillip Casciano and Tom Wineland, Vesel Radovic from New Jersey telephoned Dave Moran of Gatt in New York and offered Gatt a check for $40,000.00 to withdraw the then existing Gatt bid for

81

said New York City Transit Authority Contract/Bid #73356.

212. On or about October 9, 2007, after learning of the said telephone call by Vesel Radivic made for the purpose of buying off Gatt, Gattini in New York had a telephone conversation with Tom Wineland in California and/or Texas and/or some other state outside of New York in which Gattini complained vigorously about Gatt's being coerced by PMC Associates to give up its independent bid for said Contract/Bid #73356 and about being offered a bribe, and Tom Wineland replied to Gattini that Gatt should promptly "take the money" offered by PMC Associates.

213. Upon information and belief, following the refusal by Gatt to accept said $40,000 from PMC Associates to withdraw its bid for said Contract/Bid#73356, Phillip Casciano or another PMC Associates' employee in New Jersey telephoned or eMailed Tom Wineland in California and/or Texas and/or in some state other than New York to report of the failure by PMC Associates to buy off Gatt and reiterated his demand that the Vertex Gatt Dealers' Agreement be terminated.

214. In and about the week of October 15, 2007, the New York City Transit Authority decided to conduct a re-bidding for the Vertex radios and

accessories covered by said Contract/Bid #73356. The new bidding designation was to be Contract/Bid#73669.

215. Upon information and belief, between October 15, 2007 and October 20, 2009, Phillip Casciano in New Jersey and Tom Wineland in California and/or Texas and/or some other state than New York held one or more telephone conversations or exchanged one or more eMails in which it was agreed between them that Vertex would immediately terminate the Vertex Gatt Dealer's Agreement and thus render Gatt ineligible to participate in the re-bidding for New York City Transit Authority Contract/Bid #73669 and thus be able to maintain and further the bid-rigging enterprise carried on by the Defendants. Upon information and belief, it was further agreed that Phillip Casciano would inform the New York City Transit Authority that Gatt was being terminated as a dealer and that Gatt was therefore ineligible to participate in any further bidding for Vertex products with the New York City Transit Authority.

216. Upon information and belief, in accordance with said agreement between Phillip Casciano and Tom Wineland, Tom Wineland, on or about October 22, 2007, sent a letter from California giving notice to Gatt in New

York that the Vertex Gatt Dealer's Agreement was being terminated "Without Cause."

217. Upon information and belief, in accordance with said agreement, Phillip Casciano from New Jersey contacted the New York City Transit Authority in New York to inform the New York City Transit Authority that Gatt was being terminated as a Vertex dealer and would not be eligible to bid on any further contracts involving Vertex produces.

218. As already alleged, PMC Associates won the New York City Transit Authority Contract/Bid #73669 by an arranged and rigged bid. Gatt was not, as a result of its Vertex dealership termination, allowed to bid on Contract/Bid #73669.

219. The telephone calls, eMails, letters and faxes referred to in paragraphs 186 to 218 above constituted a pattern of interstate use of the mails or wires over an extended period for the purpose of furthering, maintaining and/or protecting the on-going bid-rigging enterprise of the Defendants which unlawful enterprise, in pursuit of limiting competition, involved fraudulent and deceptive practices.

220. The telephone calls, eMails, letters and faxes referred to

in paragraphs 198 to 217 above constituted violations of 18 U.S.C. §1341

and 18 U.S.C. §1343 and altogether constitute a pattern of "racketeering

activity" which in turn provides the predicate acts under 18 U.S.C. §1962(a),

18 U.S.C. §1962(c) , and 18 U.S.C. §1962(d) for the liability of Defendant

Phillip Casciano, Defendant Vesel Radivic, Defendant Tom Wineland,

Defendant PMC Associates, and possibly one or more of the other

Defendants.

221. As a direct result of the carrying on of an unlawful bid-rigging

scheme by the Defendants through acts, conversations and correspondence

which in themselves manifest a pattern of racketeering activity, Gatt suffered

the loss of profits which it would have earned upon being able to pursue

independent and unobstructed bidding first with N.Y.P.D. – SSD and

then with the New York City Transit Authority. These damages suffered by

Gatt were in excess of $200,000.00.

222. As a direct result of the carrying on of an unlawful bid-rigging

scheme by the Defendants through acts, conversations, and correspondence

which in themselves manifest a patter of racketeering activity, Gatt was

wrongfully terminated as a Vertex dealer, virtually put out of business and

suffered a devastating loss of its revenues and profits which it would have earned had it been allowed to continue in its business operations in an amount in excess of $1,000,000.00.

223. The Defendant Phillip Casciano, Defendant Vesel Radivic, Defendant Tom Wineland, Defendant PMC Associates, and Defendants John Doe, Richard Roe and Henry Hoe should be held liable to the Plaintiff in an amount in excess of $1,200,000.00 together with treble damages and costs, including reasonable attorneys' fees.

## AS AND FOR A FOURTH COUNT
## AGAINST DEFENDANT PM ASSOCIATES,
## DEFENDANT PHILLIP CASCIANO
## AND DEFENDANT TOM WINELAND

### (Tortious Interference With Contract)

224. Plaintiff repeats and realleges each and every allegation made heretofore herein as if set out herein in full and with the same force and effect.

225. The acts of PMC Associates, Phillip Casciano, Tom Wineland and others in inducing and/or bringing about the termination of the Gatt Vertex Dealer's Agreement were vindictive, malicious and unlawful and were taken

both in furtherance of and to protect a scheme to violate the federal Sherman

Act and Clayton Acts and the New York State Donovan Act and in order to

effect retaliation and punishment upon Gatt, as aforesaid.

226. The acts of PMC Associates, Phillip Casciano, Tom Wineland and

others as aforesaid therefore constituted a tortious interference with Gatt's

contract rights with respect to Gatt's Vertex dealer's license and render PMC

Associates, Phillip Casciano, Tom Wineland  liable to Gatt for any and

all loss suffered by Gatt as a result of the acts leading to and resulting in

such termination.

### AS AND FOR A FIFTH COUNT
### AGAINST DEFENDANT PMC ASSOCIATES
### DEFENDANT PHILLIP CASCIANO AND
### DEFENDANT TOM WINELAND
### (Tortious Interference With Prospective Business Relations)

227. Plaintiff repeats and realleges each and every allegation made

heretofore herein as if set out herein in full and with the same force and

effect.

228. The acts of PMC Associates, Phillip Casciano and Tom Wineland

in inducing and/or bringing about the termination of the Gatt Vertex Dealer's

Agreement as aforesaid therefore constituted tortious interference with business relations and render PMC Associates, Phillip Casciano and Tom Wineland liable to Gatt for any and all loss suffered by Gatt as a result of the acts leading to and resulting in such termination.

WHEREFORE, it is prayed that judgment be entered in favor of the Plaintiff GATT COMMUNICATIONS, INC. and against the Defendant PMC ASSOCIATES, LLC, Defendant PMC ASSOCIATES, INC., Defendant PHILLIP M. CASCIANO ASSOCATES, Defendant PHILLIP M. CASCIANO, Defendant BRYAN CASCIANO, Defendant THOMAS WINELAND, Defendant VESEL RADIVIC, Defendant JOHN DOE, RICHARD ROE AND HENRY HOE as follows:

A. In an amount in excess of $1,200,000.00 against all of the Defendants on the First Cause Of Action together with treble damages, costs and reasonable attorneys' fees;

B. In an amount in excess of $1,200,000.00 against all of the Defendants on the Second Cause Of Action together with treble damages, costs, and reasonable attorneys' fees;

C. In an amount in excess of $1,200,000.00 against Defendant PMC Associates, LLC and/or Defendant PMC Associates, Inc. and/or Defendant Phillip M. Casciano Associates, Inc. , Defendant Phillip Casciano, Defendant Bryan Casciano, Defendant Vesel Ramivic, Defendant Thomas Wineland, Defendant John Doe, Defendant Richard Roe and Defendant Henry Hoe on the Third Cause Of Action together with treble damages, costs and reasonable attorneys' fees;

D. In an amount in excess of $1,160,000.00 against Defendant PMC Associates, LLC and/or Defendant PMC Associates, Inc., and/or Defendant Phillip M. Casciano Associates, Inc., Defendant Phillip Casciano, Defendant Bryan Casciano, Defendant Vesel Ramivic, Defendant Thomas Wineland, Defendant John Doe, Defendant Richard Roe and Defendant Henry Hoe on the Fourth Cause Of Action together with punitive damages of no less than $150,000.00;

E. In an amount in excess of $1,160,000.00 on the Fifth Cause Of Action against Defendant PMC Associates, LLC and/or Defendant PMC Associates, Inc. and/or Defendant Phillip M. Casciano Associates, Inc., Defendant Phillip Casciano, Defendant Bryan Caciano, Defendant Vesel Ramivic, Defendant

Thomas Wineland, Defendant John Doe, Defendant Richard Roe and

Defendant Henry Hoe on the Fifth Cause Of Action together with punitive

damages of no less than $150,000.00.

F. For interest at the legal rate to commence August 1, 2007.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

> MARTIN S. RAPAPORT
> 18 East 48th Street
> New York, New York 10017
> (212) 688-1980
> email: manhatoffice@yahoo.com

By:_____
    Martin S. Rapaport (MSR 8730)

> MEYNER & LANDIS, LLP
> One Gateway Center
> Suite 2500
> Newark, New Jersey 07102-5311
> (973) 624-2800
> email: wfiore@meyner.com
> Of Counsel

Dated: December 28, 2009